WILLS—RESIDUARY CLAUSE.
    Under a will giving certain specific legacies, with a residuary clause giving all the residue of testator's property to his daughter, property bequeathed to a son for life, with remainder to the son's surviving children, passes, under the residuary clause, on the son's death without issue after the daughter's death.

Appeal from surrogate's court, Orange county.
Petition by Oscar Druland and George H. Mapes, executors of the last will of George Mapes, deceased, for distribution of property in their hands and for their discharge. From the decree rendered various interested parties appeal.
Argued before BARNARD, P. J., and PRATT, J.
*F. V. Sanford*, (*Lewis E. Carr*, of counsel,) for appellants Andrew J. Mapes and others. *W. D. Mills*, for appellants Hannah Mapes and George H. Mapes. *John F. Bradner*, for respondent the Ladies Home Society of Orange county. *B. R. Champion*, for respondents executors of George Mapes, deceased, and executors of Sarah J. Mapes, deceased. *Bangs, Stetson, Tracy & MacVeagh*, for respondent the American Bible Society.

BARNARD, P. J. The testator intended to dispose of all his property. He made certain specific legacies and bequests, and then made a very comprehensive residuary disposition of all the residue of his property to his daughter, Sarah Mapes. There was a bequest of a life-estate in $4,000 to his son, with remainder to the children of this son who survived him. It is this clause which occasions the question to be adjudged. The son died after his sister, and left no children. Did the testator keep back a possible estate to revert to him in case the son died childless? It seems very clear that he did not. He provided for the life-estate and for the remainder, and, if there was anything beyond that, he bequeathed it by the residuary clause. The intention to include in the residuary clause all the testator's property and interests is preserved, and the intention to exclude from its operation must appear by words limiting the effect of the clause, or by an intention to exclude from the whole will taken together. *Riker* v. *Cornwell*, 113 N. Y. 115, 20 N. E. Rep. 602; *Floyd* v. *Carow*, 88 N. Y. 560. The judgment should therefore be affirmed, with costs to respondent out of the estate.

---

## GERNSHEIM *et al.* v. OLCOTT *et al.*

(*Supreme Court, Special Term, New York County.* December 27, 1889.)

1. RAILROAD COMPANIES—REORGANIZATION—NEW STOCK—INJUNCTION.
    Where there is an agreement between the stockholders of a corporation and its creditors for reorganization of the company, and the issue of new stock in lieu of the old, on condition that the old stockholders pay an assessment sufficient to discharge the floating debt, and another corporation is designated to make the assess-

ment and distribute the stock, it has no arbitrary power to fix the assessment, but is charged with a trust duty, and the stockholders may enjoin the distribution of the stock until the determination of their rights under the agreement.

2. SAME—FEDERAL AND STATE COURTS.

A state court is without jurisdiction or power to interfere with a decree of foreclosure, made by the circuit court of the United States against a railroad company, where the railroad was within the jurisdiction of the court making the decree, and all the parties in interest were before it.

At chambers.   On motion to continue injunction.

Action by Michael Gernsheim, Eugene A. Loeb, and Albert Loeb, suing on behalf of themselves and all others similarly situated who may desire to come in and contribute to the expenses of the action, against Frederic P. Olcott, the Houston & Texas Central Railway Company, Collins P. Huntington, and others, to reduce an assessment levied on the stockholders, and to enjoin defendants from disposing of any stock of the new or reorganized Houston & Texas Central Railway Company.   For former litigation, see *Development Co.* v. *Railway Co.*, 27 Fed. Rep. 344; also, *Steam-Ship Co.* v. *Railway Co.*, and *Trust Co.* v. *Same*, 32 Fed. Rep. 525.

*Dittenhoefer & Gerber*, (*Frederick R. Coudert, A. J. Dittenhoefer*, and *Jefferson Chandler*, of counsel,) for plaintiffs.  *Butler, Stillman & Hubbard*, (*Almon Goodwin* and *Adrian H. Joline*, of counsel,) for defendants Olcott and Central Trust Company.  *Herbert B. Turner*, of counsel, for the Farmers Loan & Trust Company.  *Charles H. Tweed*, of counsel, for defendant Huntington.

PATTERSON, J.   On the 26th of September, 1889, one of the justices of this court granted an injunction in this action by which the defendants, their agents, servants, etc., are enjoined and restrained from executing, delivering, selling, hypothecating, giving away, or in any manner or form issuing, alienating, or parting with any shares of stock of the new or reorganized Houston & Texas Central Railway Company No. 2, or any bonds secured by mortgage upon the property of that company, or any stock or bonds issued, or intended to be issued, pursuant to an agreement dated December 20, 1887, between the several classes of mortgage bondholders of the Houston & Texas Railway Company No. 1, and the Southern Pacific Company and the Central Trust Company; and from executing or delivering any mortgage or deed of trust upon the property of said corporation, or otherwise incumbering, selling, or disposing of or alienating the property or franchises of said company, or from recording, filing, or causing, permitting, or suffering to be recorded or filed in any register's office or clerk's office, or deposited with any register or prothonotary, any mortgage or deed of trust upon the property of said corporation.   This injunction was granted upon a complaint filed by the plaintiffs Gernsheim and Loeb, suing on behalf of themselves and others similarly situated who may come in and contribute to the expenses of the suit, and upon an affidavit of Gernsheim.   The ground of restraint is that the defendants during the pendency of the suit are doing, or are about to do, certain things which would render ineffectual any judgment that might be obtained.   Leave was given in the order of injunction to the plaintiffs to serve additional affidavits, and the defendants were required to show cause why the restraint should not be continued until the final hearing of the cause.   On the return of the order to show cause, the motion now before the court to continue the injunction was argued.   The plaintiffs named upon the record were stockholders of the Houston & Texas Central Railway Company, called "No. 1," and which will be spoken of as the "old corporation."   The defendant the Central Trust Company becomes a principal defendant because it is the trustee for distribution of all the securities to be issued under the reconstruction agreement hereinafter to be referred to, and is charged with the execution of all the important details of that agreement.   It appears in an affidavit used on the argu-

ment of this motion that other stockholders, who are said to be similarly situated with the plaintiffs named in this action, have put themselves in a position, if not to take advantage of this suit, at least as protesting against the method of carrying out the reconstruction agreement; but their particular attitude to the matters under consideration will be commented upon hereafter. The plaintiffs make an attack upon the reorganization of the railroad above named, and they claim that in that reorganization they have been wronged by the parties controlling it. The accusation they make reaches back several years, and they have endeavored to show a systematic and continuous effort by those parties to get possession of this railroad, to use it for their own purposes, and to destroy the interest of a minority of the stockholders of that corporation. The material facts upon which this contention is made may be stated as follows: The Houston and Texas Central Railway Company No. 1 was a corporation organized under the laws of the state of Texas, and it owned and operated three lines of railway,—one being the main line, extending from Houston to Dennison, a distance of 345 miles; another, extending from the main line, at a place called Hempstead, to the city of Austin, in Texas, a distance of about 118 miles; and a third line, 57 miles long, known as the "Waco & Southwestern Division." In addition to these lines of railway, the company owned a very large amount of land which had been public lands of the state, and which the railway company had acquired by grant from the state of Texas. They amounted to about 10,240 acres of land for each mile of its road. At certain times, between June, 1866, and April, 1881, the railway corporation referred to executed certain mortgages as collateral security for bonds upon its railway and lands, and these mortgages were—*First*, one upon the main line, dated July 1, 1866; *second*, a mortgage on the Western Division, dated December 21, 1870; *third*, a mortgage on the Waco & Southwestern Division, made in June, 1873; *fourth*, a mortgage known as the "Main Line & Western Division Consolidated Mortgage" made in October, 1872; *fifth*, a mortgage known as the "Waco & Southwestern Division Mortgage," made in May, 1875; *sixth*, a mortgage made in May, 1877, known as the "Income Indemnity Mortgage," covering certain parts of the road therein named, and certain land grants; and, *seventh*, a mortgage made in April, 1881, called a "General Mortgage," covering all the railways of the company and its franchises, including all its real and personal property acquired or to be acquired in the state of Texas, and all the lands covered by the land grants. Sixteen million eight hundred and twenty-three thousand dollars of bonds to be issued under this mortgage were to be reserved by the trustees, and not issued, except for the purpose of exchanging and retiring bonds, then outstanding, issued by that railway company.

The history of this particular litigation begins about the year 1883, and it is set forth in the motion papers that in and prior to that year the greater part of the stock of the Houston & Texas Railway Company, and the controlling interest in that company was owned by Morgan's Louisiana & Texas Railroad & Steam-Ship Company, a corporation; and that the defendant Huntington and his associates, interested in another corporation called the "Southern Development Company," sought to obtain the control of the Morgan Company, and thereby to acquire the ownership or the majority influence in the Houston & Texas Central Railway Company; and that the Southern Development Company and another company, called the "Southern Pacific Company," in which Huntington was interested, acquired the interest of the Southern Development Company in the railroad referred to, and thus, in the name of the "Southern Pacific Company," obtained that control, and became dominant in the Houston & Texas Central Railway Company; and that, immediately upon getting such control, there was begun a series of machinations with a view to acquiring complete possession of this Houston & Texas Central Railway, to the exclusion of the minority owners, and in such a way as to destroy the in-

terests of those minority owners in that railroad corporation. It is suggested in the moving papers that the first step taken to accomplish this purpose was that the Southern Development Company, in January, 1885, acquired, by purchase from holders thereof, the coupons of the first mortgage bonds on the main line and branches, such coupons not having been paid by the railway company, and that after the Southern Development Company got possession of those coupons they began a suit in Texas against the Houston & Texas Central Railway Company; claimed therein that that company was indebted to it (the Southern Development Company) in the sum of $600,000 for money loaned, and in that suit had a receiver appointed of the Houston & Texas Railway Company. The order appointing this receiver was made, with the consent of the railway company, in 1885. Thereafter, in January, 1886, the trustees of certain of the mortgages filed bills for the foreclosure of such mortgages, and these actions were pending in May, 1886, as was also another action, brought by the Farmers' Loan & Trust Company, as trustee of certain other of the mortgages above referred to; and all the suits for the foreclosure of mortgages were consolidated by an order of the United States circuit court for the eastern district of Texas, in which all such actions were pending, such order being made at the May term, 1886. It further appears by the moving papers that the suit of the Southern Development Company against the railway company was dismissed by the court, and in the consolidated mortgage foreclosure cause receivers were appointed by the United States circuit court; and to the appointment of those receivers of the Houston & Texas Central Railway Company that company consented, through its attorneys representing it. In all these suits, and in the consolidated suit, the first mortgage of the Waco and Southwestern Division was not included.

What is called an important fact is now made prominent in the record; and that is that at the time of the commencement of these foreclosure suits, and at the time of the consolidation of those suits, none of the bonds had matured, and no part of the principal of the mortgages, or either of them, was due. It is apparent, upon reading these mortgages, that none of them were by their express terms liable to be foreclosed for the non-payment of interest. Provision was made in them for what should be done to protect the bondholders in case of non-payment of interest; that is to say, the trustees of the mortgages were to take possession of the road, and operate it and its branches, or those parts of the road and branches covered by the mortgages, of which they were the trustees respectively, in the interest of the bondholders. The consolidated foreclosure suit went to a decree; but before that decree was entered there had been much negotiation between committees representing the holders of various classes of mortgage securities and the railroad company and the trustees of the mortgages with reference to what should be done to protect their interests, and as to what arrangement should be made respecting a decree to bring about that result. In some of the foreclosure suits preceding the consolidation of the actions in May, 1886, defenses had been interposed setting up that by the terms of the mortgages the principal was not due, and hence decrees of foreclosure could not be made, and that the lands should be sold before the railway or its franchises were resorted to. On the agreement which was entered into between all the parties to the suits for a decree in the consolidated suit, these defenses, to which allusion has been made, were withdrawn, and a decree was entered for the foreclosure and sale of all the lines of railway and the lands, the Waco Division to be sold subject to the first mortgage thereon; and this arrangement was made in view of, and to carry out the agreement of reconstruction, which agreement of reconstruction is undoubtedly the particular thing which is meant to be assailed in this action. But it is urged by the plaintiffs that the first stage in the accomplishment of the scheme by which certain of the defendants attempted to destroy the interests of the stockholders of the railway company was attained

when the answers above referred to were withdrawn, and the consolidated suit was allowed to proceed, on the basis that all the mortgages might be foreclosed for non-payment of interest. The agreement of reconstruction was made December 20, 1887, and provides, in substance, that a new corporation, by the same name, is to be created under the laws of the state of Texas, and it is known in this action as the "Houston & Texas Railroad Company No. 2;" but I shall call it the "new corporation;" that the Central Trust Company of the City of New York, of which the defendant Olcott is president, shall be the purchaser at the foreclosure sale of all the lines of railway and lands, except the Waco Division, which was bought in by Mr. Downs, and that upon such purchase the reconstruction agreement should be carried out by the creation and distribution of various securities among the mortgage bondholders who were interested under the mortgages that were foreclosed in the consolidated suit, and it provides for a material decrease in the rate of interest such securities are to bear. It also provides for the payment of a bonus of $50 per bond to holders of the old first mortgage bonds on interest account. In this reconstruction agreement, provision is also made for the benefit of the stockholders of the old corporation. They may participate in, and become entitled to, such an equal part of the shares in the new corporation as were held by them in the old corporation, provided they pay an assessment on the shares to be taken by them of stock in the new corporation. Such assessment to be for the purpose of paying off the floating debt of the old corporation, and certain expenses of the nature and character therein stated. The provision respecting stockholders of the old corporation also recites that if those stockholders do not avail themselves of the privilege of taking shares, then the Southern Pacific Company may take them on very different and much more advantageous terms. The decree in the consolidated suit was entered May 4, 1888, and under it a sale was had, the property bought in as required by the agreement, and the reorganization has been proceeded with.

This general statement of the principal facts in the case is sufficient as a basis for the consideration of the claims now advanced by the plaintiffs on the record in maintenance of the injunction, and they stand upon these propositions: That it is apparent from the history of the transaction as spread upon the papers, and as generally indicated here, that Mr. Huntington and his associates, through the corporations in which they were interested or which they controlled, undertook to acquire the ownership of the Houston & Texas Central Railway Company in order to make it tributary to, and a part of, certain interests and enterprises of their own; that, in order to accomplish that purpose, they first acquired a controlling interest in the stock of the railway company, then advanced money to pay coupons on first mortgage bonds, and took an assignment to themselves of such coupons, and then devised the scheme by which the road should be put in the hands of a receiver, and that certain foreclosure suits, which were resisted by the trustees of the mortgage, should all be consolidated in one suit, which they could control; that then an agreement should be made among the representatives of the various securities, other than stockholders, for a decree and sale of the railway under foreclosure, although the mortgages were not yet due; that on such sale the property should be bid in by some one named as trustee to carry out the provisions of a reconstruction agreement, under which agreement terms were to be made which would leave it in the hands of Huntington and his associates to so manipulate the accounts and indebtedness of the road, and put so large an obligation upon the stockholders as necessarily would prevent their taking stock in the new corporation, and would induce them to forfeit their right to come in under that agreement, and thus leave the whole of the stock in such a situation that it would be issued, according to the terms of the reconstruction agreement, substantially to the Southern Pacific Company, which was to ultimately reap the benefit of the scheme. It appears, further, in the plain-

tiffs' papers that at the time the reconstruction agreement was entered into the directors of the old corporation were the same persons who were interested in what are called the "Huntington corporations," and that, therefore, those who were charged with the protection of the stockholders of the old. Houston & Texas Railway Company were the same persons whose interest it was to acquire the property and franchises of that corporation in order that they might extinguish the minority interest of the stockholders of that corporation, and thus accomplish the intent ascribed to them, or to Mr. Huntington, which has been referred to. In opposition to the motion, the answers of the Central Trust Company and of Huntington, and various affidavits, have been read, and the charges of fraud and collusion have been fully denied; and from these denials, under oath, sustained by facts recited, and the explanations stated in the affidavit of the president of the Farmers' Loan & Trust Company and of Mr. Turner, it sufficiently appears that the foreclosure suits were conducted and carried to decree solely in the interest of the incumbrancers, and without any design to aid in a scheme to injure stockholders of the railroad corporation. All that is alleged respecting the initiation and accomplishment of a purpose to destroy the minority interest lacks proof upon which a court would be justified in holding this injunction in force in its broad terms. Something more than a patchwork of suspicions is required to keep suspended and in confusion the interests of those who are entitled to bonds under the reorganization agreement. But, further, it is so apparent as to be self-evident that this court has neither jurisdiction nor power to interfere with the decree which was made by the circuit court of the United States in the consolidated suit for the foreclosure of these mortgages. The railroad was within the jurisdiction of the court. All the parties in interest were before it. The stockholders were represented by the corporation which was a party to the action, and appeared by counsel. It was entirely within the jurisdiction of that court to make the decree which it did make; and that decree is not subject in any way to review or revision by this court. . If the stockholders are aggrieved by any of the provisions of that decree, their remedy is to apply in that forum for relief. All the defenses that are suggested as applicable to the mortgages were before that court, actually interposed and subject to its cognizance; and, although it is said that those defenses were withdrawn by consent, which is undoubtedly the fact, yet it is obvious from the record that the court considered those matters of defense, and made a finding that a foreclosure should be decreed for non-payment of interest. But, whether it did or did not consider them, it was competent to that court to make such a decree as seemed proper to it, under all. the circumstances; and any attempt on the part of this court to interfere with that decree, or the proceedings had under it, would be a mere futility. It is obvious, therefore, that in this action, constructed as it is, the plaintiffs could not obtain any relief looking to the setting aside of that decree, or the sale made under it, or any arrangement made by the purchaser at the sale, or procure in this suit any radical or other change in the reconstruction agreement pursuant to which the property was bought in under the decree. All that is completely beyond the power and control of this court. Therefore, I am not called upon now to determine whether or not the mortgages could have been foreclosed until default was made in the payment of the principal sums, secured by them respectively, although, if the question were to arise as *res nova,* there would not be much difficulty in its solution. There certainly was a default in the payment of interest; and it may well have been considered by the court in which the decree was made that the provisions for trustees taking possession and operating the road on default in the payment of interest was not an exclusive remedy, but was merely one method of procedure on such default, and did not prevent the remedy of foreclosure for non-payment of that interest, which, while it would have led to a different form of decree,.

and would have probably included a right of redemption on the payment of interest and expenses, would nevertheless have given to a purchaser under such a decree a title to be defeated only by a compliance with such conditions as might be annexed to such right of redemption. It is profitless, however, to speculate upon the possibilities of the case. It is sufficient that, with every interest before the court, and with undoubted jurisdiction to make precisely the decree that was entered, it has adjudicated upon all the matters which on this branch of the case are now challenged by the plaintiffs, and that this court is entirely without authority either to review that decree or to interfere with its execution, or to set aside and ignore the terms of the instrument under which the bidder and purchaser at the sale under that decree has undertaken to dispose of the property it has purchased.

But, even if this were not so, the case presented by the plaintiffs does not commend itself to the court as one indicating any right on the part of such plaintiffs to assail the foreclosure decree or the reconstruction agreement. The averments of the complaint are very general and vague respecting the attitude of the plaintiffs to this decree, and to the reconstruction agreement. They do not state in unqualified terms that these plaintiffs objected either to the decree or the agreement; and, while they say that they expected proper defenses to be interposed, and that, if a reconstruction of the road took place, their rights as stockholders would be protected, and that they were lulled into inaction because of that expectation, they nowhere distinctly and plainly show that they did not know that the decree of foreclosure was to be made by consent of all the parties to the suit, or that it was not for the best interest of the road and themselves, as stockholders, that the mortgages should be foreclosed, or that a reconstruction under the very agreement which is now drawn in question was not for the best interest of all concerned. Manifestly, if the reconstruction were carried out in good faith, and the rights of the stockholders were protected and preserved, they would have been benefited by the cutting down of interest and fixed charges; and it is not at all a gratuitous assumption that all stockholders would have willingly acquiesced in the reconstruction agreement, provided it was carried out in good faith, and without any effort to destroy their interest as such stockholders. It seems to me that it is the result, and not the method, which has induced this assault upon the proceedings antedating the levying of the assessment on the stockholders. The reconstruction agreement was made on the 20th December, 1887. This suit was not brought until September, 1889. It is nowhere explained in the moving papers why these plaintiffs remained quiescent for nearly two years without making any demonstration against the reconstruction agreement or the proceedings in the United States court which eventuated in the decree of foreclosure, except as above stated; and it is almost apparent that they were willing to take their chances under that agreement, and to acquiesce in all the proceedings that were had pursuant to it until they ascertained that the heavy assessment of 73 per cent. of which they complain was levied upon them, to enable them to take stock in the new corporation. This view is sustained by a document which the plaintiffs have introduced respecting other stockholders of the old company, who protest against the assessment on the stock. It is contained in the affidavit of M. Gernsheim, sworn to on November 20, 1889. He states that stockholders of the old company, holding shares of about $1,000,000 par value, have served a protest on the Central Trust Company, relating to the matters connected with this litigation. In this protest there is not one word relating to anything else than the reconstruction agreement; and it is a protest merely against the action of the Central Trust Company in fixing the amount determined by that company as the sum to be paid by the shareholders of the old company in order to entitle them to take stock in the new company, and the grounds are stated as follows: *First*, that the amounts fixed are not in accordance with the terms of the articles of agreement of re-

organization; *second,* as embodying claims not a legitimate part of the floating debt of the company, and which are illegal and invalid and unauthorized under the terms of that agreement, and they give notice to the trust company "that they will contest the delivery of the stock as unauthorized under the terms of the reorganization agreement."

As I understand the case, after a minute examination of all these papers, and of all the facts which are presented upon this application, I am forced to the conclusion that these plaintiffs are not in a position to assail in this action either the decree of the United States circuit court in Texas, above referred to, or the reconstruction agreement, or the acts of the Central Trust Company under that agreement, so far as they relate to anything but stock in the new corporation, or to prevent the distribution of any of the securities by the Central Trust Company under that agreement which are to be handed over to the bondholders of the old corporation in exchange or substitution for the securities held by them, and that the only ground upon which they can ask the interposition of this court is in relation to the distribution of the stock in the new corporation; and I will now proceed to the consideration of that subject which presents the only question upon which this court, in my judgment, can assume to act. The power of this court to entertain that subject is based upon the fact that the Central Trust Company is a corporation of this state; and, under the reconstruction agreement, has become charged with a trust duty as to the distribution of that stock, and the plaintiffs are beneficiaries under the reconstruction agreement. They have rights under that agreement, and, as before intimated, those rights were conceded to them as part of the general scheme of compromise, by which the affairs of this railway company were to be adjusted, and the reorganization to go forward. All the stockholders are bound by that agreement, if they are to accept its advantages, so far as this cause is concerned. If they are to take stock in the new company, they must pay a proper assessment. It was to be fixed by the Central Trust Company; but I do not understand that this gave to the trust company any arbitrary power in fixing that assessment. It was bound to investigate, and ascertain the actual floating debt; for the assessment was to cover the floating debt and other charges named in the agreement. The stockholders have a right to know what the floating debt was or is for which they are to be charged, and they have a right to a fair and open account of that indebtedness, unless it is to be held that they came into the reconstruction agreement as a mere matter of grace, a view I am not able to adopt. At this point I think the injunction is proper until this subject is determined, and I have reached this conclusion in view of the following circumstances: It is alleged in the complaint that "the said assessment was made unnecessarily high, and, as plaintiffs verily believe and charge, in bad faith, by said Huntington and his associates, to bar out the present stockholders, and to enable, under the said plan of reorganization, the Southern Pacific Company to acquire the entire stock on the payment simply of the amount required to be paid to the first mortgage bondholders for interest and bonus, and the expenses of the reorganization." It is clear that the amount of the assessment, 73 per cent., or $5,640,637 on the $7,726,900 issued capital stock of the old corporation, is a very heavy sum with which the shares are weighted at the very birth of the new corporation; and it is also clear that the stockholders of the old corporation alone are to bear that burden, and that the Southern Pacific Company, which may take the shares if the old stockholders do not take them, will get them on much easier terms, (about 24 per cent.,) and that it is confessed that the Southern Pacific Company is interested in acquiring this line of railway to operate in connection with its own system. It is true, however, that since 1884 the road has not been administered by Huntington or his associates, although its board of directors was principally composed of persons likewise directors in the so-called "Huntington roads," but by receivers appointed by

the United States circuit court, and that by the terms of the reconstruction agreement the Central Trust Company was to fix the assessment to pay the floating debt and expenses alluded to. That company has shown what amounts of particular indebtedness it has adopted as making up the gross sum of $5,640,637. Among them are two very large amounts, viz., Morgan's Louisiana & Texas Railroad and Steam-Ship Company, $1,702,364.14, and Southern Development Company, $866,302.93. There is nothing to show that the trust company has done anything to verify any of this indebtedness. The two claims seem to have been put in judgment in May, 1889, but both the debtor and creditor corporations were substantially managed by the same persons; and the plaintiffs here are entitled to full knowledge, and a disclosure of all the details of this indebtedness. I do not mean to express any opinion whatever adverse to the entire good faith of the trust company. The only question is whether the stockholders of the old company, under the reconstruction agreement, have a right to inquire into the indebtedness with which they are sought to be charged. I think they have such right; and, in order to make effectual any judgment they may obtain reducing the assessment, the injunction should be maintained prohibiting the distribution of the shares in the new company until the trial of the action. To that extent the injunction will be continued; but in all other respects it will be discharged.